# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

RxUSA, Inc. and RxUSA INTERNATIONAL, Inc.,

                Plaintiffs,

                                      **Case No. 06-C-790**

      **-vs-**

CAPITAL RETURNS, Inc., CLAUDE A. DANCE,
PETE M. SKLADANEK and JOHN DOES 1-10,

                Defendants.

---

# DECISION AND ORDER

---

      Plaintiffs Rx USA, Inc. and RxUSA International, Inc. (collectively "RxUSA") sell pharmaceutical products to retailers, wholesalers and institutions. Defendant Capital Returns, Inc. ("Capital Returns" or "Capital") is a reverse distributor of pharmaceutical products engaged in the business of returning pharmaceutical products to manufacturers on behalf of clients and arranging for the destruction of outdated and non-returnable pharmaceutical products. In 2003, RxUSA contracted for the use of Capital Returns' reverse distribution services.

      RxUSA argues that it was promised and entitled to almost $1.7 million in return for its pharmaceuticals but received only $827,034.02. RxUSA brings claims in diversity for

intentional misrepresentation, breach of warranty, negligence and breach of contract.[1] Capital Returns alleges a breach of contract counterclaim for unpaid commission payments.

Now before the Court is Capital's motion for summary judgment. For the reasons that follow, this motion is denied.

## BACKGROUND

Plaintiffs RxUSA and RxUSA International are foreign corporations, both of which are incorporated in New York. RxUSA is comprised of different divisions, some of which are retail sellers of pharmaceuticals, some of which are wholesale sellers. Robert Drucker owns 80% of RxUSA. Mark Scovotti owns 20% of RxUSA.

Defendant Capital Returns is a Wisconsin corporation. Defendant Claude A. Dance ("Dance") is the Vice-President of Sales and Marketing for Capital Returns. Mr. Dance is a resident of Wisconsin. Defendant Pete M. Skladanek ("Skladanek") is a Regional Account Representative for Capital Returns. Mr. Skladanek is a resident of Wisconsin.[2]

In the pharmaceutical industry, manufacturers typically provide various types of credit for outdated or expired pharmaceutical products returned by their distributors. The process of returning such outdated pharmaceuticals for credit is known as "reverse distribution." Capital Returns functions as a reverse distributor, handling the logistics and details of the return process for distributors and manufacturers in exchange for a fee.

---

[1] RxUSA withdrew its accounting claim during the course of summary judgment briefing.

[2] This matter was originally filed in the Eastern District of New York, but transferred here pursuant to a valid forum selection clause.

## I.   Initial Solicitation

In 2003, Ronald Roach ("Roach") was the Institutional Business Manager for Capital Returns.  Roach was in charge of supervising the institutional sales team and generating new sales opportunities.  Roach was authorized to prepare and send out sales proposals to potential customers.  He had standard form proposals on his computer that he would fill-in with customer-particular information.

On or about October 8, 2003, Roach sent a written Pharmaceutical Returns Management Proposal to RxUSA.  The proposal indicated that Capital Returns would separate returnable from non-returnable products and determine the return value of the returnable products in accordance with manufacturers' then-existing policies. Capital would also send to RxUSA a "compliance portfolio" which contained the details of the return (*i.e.*, what was returnable and what was not), according to the then-existing policy of each applicable manufacturer.  The Compliance Portfolio was supposed to contain "the return summary and the outdate report of what happened with all of the drugs [received from RxUSA] and why," as well as the waste detail.

In the initial solicitation, Capital represented that its "compliance portfolio" would contain an "Estimated Return Value" or "ERV" applicable to what Capital determined to be the returnable portion of the products submitted by RxUSA for return.  Capital generally calculates ERV based upon manufacturer policies. The initial solicitation stated that RxUSA would be assured of a "realistic return value."  Capital's salespeople explained to potential customers that ERV was the amount of credit which could be reasonably expected in return

-3-

for expired goods. RxUSA understood that ERV equaled the creditable amount, as calculated by Capital in conformance with manufacturer policies, which RxUSA should receive for outdated returnable product. "Creditable" means the dollar amount Capital's client expected to receive from the manufacturer in credits.

In the initial solicitation, Capital represented that it would prepare a "Return Summary" (as part of the Compliance Portfolio) which broke down Capital's ERV by manufacturer, detailing the credits that RxUSA would receive from each manufacturer. Capital also represented that it would prepare a "Waste Detail Report" (as part of the Compliance Portfolio) indicating which of RxUSA's products were not returnable. The first proposal further contained a section entitled "100% Guarantee" stating as follows: "Capital Returns guarantees that customers actively participating in the program will receive 100% of the Estimated Return Value. If the Estimated Return Value is less than 100%, we will issue the pharmacy a credit for the difference of our service fee."

The initial solicitation requested a fee of 7% of Capital's ERV. The initial solicitation contained additional representations, to wit: (1) Capital would "partner with RxUSA to ensure that RxUSA received the maximum possible amount of credit for its returned pharmaceutical products; (2) Capital would provide "a comprehensive service that maximizes credit return to RxUSA"; (3) Capital maintained a "complete tracking system for both returnable and non-returnable pharmaceutical products"; (4) Capital would "access a database of over 350,000 line items, which was updated continuously with current manufacturers' return policies" and was current as of the month RxUSA provided a pre-

-4-

shipment inventory analysis of product being sent, so as to ensure that all returns were properly submitted and all funds claimed were received by RxUSA; (5) RxUSA was assured of receiving a realistic return value; (6) Capital would "prepare all pharmacy products for return according to the manufacturers' instructions" including "completing forms, faxing for Return Goods Authorization numbers, or calling for special instructions"; (7) Capital would accurately separate returnable products from nonreturnable products based upon current manufacturer policy; (8) Capital would maintain, on file at its offices, copies of all "Certificates of Destruction" of all non-returnable products that are sent by Capital to waste incineration facilities for destruction.

Finally, the initial solicitation represented that "accounts are processed within ten (10) business days of receipt." It contained a section entitled "Partnership Commitments," which provided that Capital would "partner with RxUSA to provide proactive information to return real dollars to RxUSA's pharmacy budgets."

## II. Second Solicitation

On October 9, 2003, Roach and Deborah Kanak ("Kanak"), Capital's Director of Sales and Sales Support, sent a revised proposal to RxUSA. It contained the same representations that were included in the initial proposal, except that it contained a requested fee of 3% of Estimated Acquisition Cost ("EAC"), not ERV. EAC is a term of art in the pharmaceutical distribution industry. It is an estimate of the price paid by the distributor when it purchased the product. EAC is not always the same as ERV, i.e., the value of the credit a manufacturer will give for returnable product, particularly as different manufacturers

-5-

have different return policies and may not provide any credit at all. EAC includes the cost to acquire product that is both returnable and non-returnable waste.

The second solicitation also contained a description of an additional service, an extranet based system operated by Capital called the "CapNet Online Returns Information Access" program. The CapNet system was set up to draw information from Capital's database and put it on the internet so that it would be accessible to Capital's clients. That information included net return value statistics and real-time access to all returns data. It was a significant selling point to Capital's clients that they could track their return online instantaneously. RxUSA was never given access to this system.

## III.    Further Solicitations

On October 10, 2003, Roach made additional written representations to RxUSA. The third solicitation stated that by "partnering with Capital Returns, Inc., the leader in pharmaceutical returns processing, you will realize the benefits of the best returns service in the industry." It stated that Capital's "customized reports offer comprehensive information detailing the estimated credit due from each manufacturer so you know what to expect." It represented that RxUSA would receive a "personal account manager" who would be RxUSA's "partner," would "facilitate the returns process" and "address any concerns that may arise." It stated that RxUSA would receive a "professional customer service reconciliation representative" who would "research the status of [RxUSA's] credit and provide [RxUSA] with up to date information." Finally, the letter stated that RxUSA should "simply ship all outdated pharmaceuticals together" to Capital and Capital "will take care of

-6-

the rest." The letter emphasized that RxUSA should "choose Capital Returns, Inc. as [its] partner in pharmaceutical returns management."

On or about October 17, 2003, Capital (through defendant Dance) sent RxUSA a document entitled "Capital Returns – Partner with the Leader in Pharmaceutical Returns Management." This document contained a synopsis of various manufacturer return policies, including the statement that "indirect accounts must include wholesaler information and DEA# to avoid a delay in processing." This solicitation also included the returned goods policies of eleven manufacturers. Only two of those manufacturers (Ovation Pharmaceuticals and UDL Laboratories) limited returns to "direct accounts only," *i.e.*, those entities which purchased goods directly from those manufacturers (as opposed to having purchased them from a reseller). All others accepted return goods from indirect purchasers, such as RxUSA. RxUSA did not attempt to return any goods from Ovation or UDL.

The fourth solicitation also represented that CapNet, "the industry's first on-line returns information program," was "available exclusively to [Capital's] business partners," and provided a "bird's eye view of all member returns delivered right to [RxUSA's] desktop." It further stated that RxUSA would have "real time access" to "current return data" which would allow them to "instantaneously ascertain what the status was of any particular product that had been returned."

Capital was the "end user" for some pharmaceutical manufacturers. For those manufacturers, Capital would receive goods, determine which of the same were returnable or creditable according to the manufacturer's policies, notify the manufacturer of that

-7-

determination, and then destroy the returnable product. Once Capital made that determination, there was no further review by the manufacturer. Capital was the end user for 11 manufacturers in 2003.

## IV.    Final Negotiations

On or about October 14, 2003, Roach, on behalf of Capital, sent a proposed agreement to RxUSA. The proposed agreement provided for a fee of 6.25% of ERV, defined as "an estimate of the refunds and/or credits to be obtained from the manufacturer/wholesaler based upon a bid price of a current Wholesaler Acquisition Cost (WAC) price of the products, whichever is applicable."

On October 15, Mark Scovotti from RxUSA sent an email to Roach, stating that he found "no guarantee" in the proposed contract. In a subsequent conversation with Roach, RxUSA stated that it had seen a "guarantee" in the prior solicitations and inquired as to why it was not contained in the proposed contract. Roach replied that it was unnecessary to place it in the contract because it was contained in the solicitation materials and that it was, therefore, a normal contractual responsibility for Capital. Roach pointed out that the proposed contract contained a provision stating that the agreement included the "normal contractual responsibilities" for each party, which would cover the responsibilities listed in the solicitations.

In a subsequent conversation with Mr. Roach, Mr. Scovotti from RxUSA advised that it wanted Capital to hold any product deemed returnable for a period of time to obtain a return authorization from the applicable manufacturer authorizing a return of the goods.

-8-

Failing the obtainment of a return authorization, Scovotti wanted the goods returned to RxUSA. RxUSA specifically stated that it "wanted to get back the product that Capital said was returnable but that the manufacturer wouldn't take back." Roach thereafter discussed RxUSA's concerns with defendant Claude Dance.

As a result of those discussions, on October 16, Dance sent an e-mail to RxUSA, stating that Capital "delivers what it presents," maximizes the value of returns, ensures "accuracy of production" and "access to useful information," and commits to a 10-day turnaround. The October 16 email contained two pricing options: (1) 5.5% of Capital's ERV or (2) 2.5% of EAC. Neither ERV nor EAC were defined in Dance's email.

On October 17, Mr. Scovotti from RxUSA sent an e-mail to Mr. Dance stating that RxUSA chose the EAC-based fee structure. RxUSA also repeated that it was "concerned about product that your company deems returnable but the manufacturer does not," and asked "what happens in this scenario?" Later the same day, Dance responded by saying that it would "hold inventory (returnable) for 30 days if we have not received approval for the return we can send back to you as requested." Capital never returned product to RxUSA, whether a Return Authorization was generated or not.

On multiple occasions between October 17 and October 20, Dance orally represented to RxUSA that once Capital determined the ERV of RxUSA's pharmaceutical goods, RxUSA would receive 100% thereof within, at most, ninety days, because Capital purportedly represented the various manufacturers involved in the return, was acting as those

-9-

manufacturers' agent, and was therefore authorized to commit to the return value to be received within the represented ninety-day time frame.

On October 20, RxUSA forwarded to Capital a pro forma document setting forth the pharmaceutical products that RxUSA intended to deliver to Capital for processing if an agreement could be reached, and requested that Capital give RxUSA an oral ball park estimate as to the return value of the same. On October 20, Dance orally warranted and represented to RxUSA that the return value of the materials was in excess of $1.7 million. Dance did not ask RxUSA whether the goods had been acquired directly from the manufacturers or through another wholesaler.

## V.    Service Agreement

On October 20, Capital and RxUSA entered into a one-year Service Agreement. Section 11 of the Service Agreement states: "**Return Policy.** Capital Returns will process pharmaceutical product to obtain available manufacturer credit. Capital Returns does not warrant that any current manufacturer refund policies will continue or that any processing of outdates will result in a credit to RxUSA. In the event RxUSA elects to have Capital Returns ship any creditable inventory to RxUSA, Capital Returns shall not be held liable in any manner for the safety or efficacy of such inventory and as a licensed distributor in the state of Wisconsin is governed by PDMA CRF 200-299." The Service Agreement also contains an integration clause which states: "**Entire Agreement.** This Agreement contains the full agreement between the parties. The parties herein intend and agree that this Agreement is to be executed as a Wisconsin Agreement and to be construed in accordance

-10-

with the laws of the State of Wisconsin." Despite the lack of a specific provision, Capital understood that RxUSA had the right to have its product returned in the event that no Return Authorization was received within thirty days of processing the RxUSA goods.

RxUSA explicitly chose the terms of Capital's commission rate, 2.5% of EAC, which gave Capital Returns a lower percentage commission based on the entire estimated amount of the return (both returnable and unreturnable product) versus a higher percentage commission based on returnable product only.[3] Even before the Service Agreement was executed, Defendant Dance stated that Robert Ryan, the Chief Executive Officer of Capital, believed that the 2.5% of EAC service fee agreed to by Capital was too low, and further admitted that Ryan "may be right."

## VI.    Performance Under the Service Agreement

The Service Agreement contained a provision that "shipping charges from RxUSA to Capital Returns will be prepaid by or charged to RxUSA." The Agreement also provides, in the same section, that Capital is solely responsible for "shipping and handling costs from Capital Returns to the manufacturer(s)." On October 20, 2003, before any goods were shipped by RxUSA to Capital, Skladanek sought to upcharge those freight charges as follows: "This is a new acct. that is sending us 6 skids collect via Roadway soon. Since part of their contract is that they will be paying for the ship-in charges (after-the-fact), we need

---

[3]    Section 4 of the Service Agreement provides: "Service fee will be 2.50% of the estimated acquisition value (EAC) of all inventory shipped to Capital Returns for processing. Capital Returns will invoice RxUSA directly. . . . EAC shall mean the total value associated with the return based upon the bid price or a discounted average wholesale price (AWP) of all products returned to Capital Returns."

to be sure that these charges are added to the folder before we mail out the invoice. Per Claude we will be adding a 10% service fee to these collect charges as well . . ."[4]

On or about October 21, 2003, and before any shipment was made by RxUSA to Capital, Skladanek sent an e-mail to RxUSA, thanking RxUSA for "partnering" with Capital, and representing that Capital had "one vision – to structure customized returns management programs for our customers that will maximize the values of the returns . . ." Skladanek offered to answer any questions about "our partnership." According to Skladanek, the use of the word "partnering" by Capital was a "sale term" intended to "be construed by RxUSA as meaning that there would be a relationship of trust between the parties."

In or about early November 2003, RxUSA shipped pharmaceutical products to Capital for return processing. On or about November 11, 2003, Capital sent to RxUSA a formal Return Detail Report showing that Capital's calculation of the Return Value of RxUSA's goods was $1,733,962.73 and a Waste Detail Report showing the value of non-returnable goods was $45,932.61.[5]

Based upon the Service Agreement and the accompanying representations from Capital, RxUSA expected to receive $1,733,962.55 (the amount of Capital's ERV), less

---

[4] On November 4, 2003, Capital sought to further upcharge those freight expenses, and bill in advance for "potential" additional charges, when Defendant Dance directed the following: "we may be sending some inventory back, we will need to estimate this cost and add it to the freight bill, in addition I would suggest as a minimum a 20% upcharge. . . ." Capital billed RxUSA for $1,353.39 in shipping charges. It is unclear if any of this amount was related to upcharges.

[5] The Waste Detail Report set forth the reasons why Capital deemed such goods "nonreturnable," including: (1) the manufacturer accepts only full cases, (2) the manufacturer does not accept outdates, (3) the manufacturer accepts direct accounts only (*i.e.*, returns from entities that purchased the goods directly from the manufacturer), (4) the manufacturer does not accept returns at all, (5) the product is beyond its permissible return date and (6) the manufacturer does not accept partial returns. None of those reasons for rejection appeared on Capital's report with respect to the returnable goods which Capital represented had a return value of $1,733,962.73.

-12-

Capital's 2.5% fee ($43,349.06) in manufacturers' credits within 90 days (on or before February 11, 2004). Capital obtained for RxUSA the aggregate sum of only $827,034.02 in manufacturers' credits, only a small percentage of which was procured on or before February 11, 2004. Capital either shipped out RxUSA's inventory for return to the various manufacturers or destroyed it pursuant to the manufacturer's policy.

RxUSA failed to receive more credit primarily for the following reasons:

- Apotex, one of the "big 3" manufacturers, refused to provide a $380,305.76 credit to RxUSA until RxUSA produced original invoices to Apotex for the product returned. In a letter dated August 3, 2004 to RxUSA from Apotex's counsel, Apotex advised RxUSA that the denial of credit to RxUSA tried to process its return through McKesson Drug Company though Apotex had determined that a majority of the product had not been purchased through McKesson. Though Apotex was still willing to grant credit if RxUSA produced invoices, RxUSA refused to provide any invoices for the product RxUSA claimed to have purchased.

- PLIVA refused to provide an estimated credit of $297,346.59 because RxUSA was not a "direct buyer" of the product from the manufacturer. PLIVA also requested proof of purchase that was never forthcoming.

By the middle of December 2003, RxUSA started to press Capital for reports as to which product shipped at what time. On December 22, 2003, defendants Skladanek and Dance advised Rx USA's principal, Robert Drucker, that Capital received Return Authorizations for all of the RxUSA goods at Capital's ERV values, that those goods had purportedly been shipped to the respective manufacturers, and that credits for the goods would be issued shortly. When RxUSA asked for a breakdown of that, Skladanek advised RxUSA that he would prepare a spreadsheet, to include the Return Authorization and the dates, and fax it to RxUSA.

-13-

The following day, Skladanek sent an internal e-mail to Dance attaching a draft of a table containing a breakdown, by manufacturer, ERV, Return Authorization and ship date, of the RxUSA return. Skladanek asked for information regarding ship dates to manufacturers for RxUSA products that were highlighted in his table. A few hours later, after seeing the table and the highlighted portions that did not include any ship dates, Dance sent an e-mail to Capital's CEO, wherein Dance admitted that "on the call yesterday [with RxUSA] we sold something much different as for ship outs – I hope we find our information is wrong, either way it stinks."

On December 29, Capital (through Skladanek) sent to RxUSA a table of what purported to be a breakdown, by manufacturer, of RxUSA's returnable product, setting forth Capital's ERV, the Return Authorizations received for that ERV, the dates of the Return Authorizations, and whether or not the product was actually shipped to the manufacturer. The table was sent to "let [RxUSA] now [sic] that they could expect to receive $1,700,000 and change." However, the return to Pliva (Sidmak) indicated an ERV of $297,056.59, but the actual Return Authorization was for only $15,735.96 according to Pliva's return policy. Additionally, Capital never received any Return Authorizations from almost half (14 of 30) of the manufacturers reflected in the table. Capital destroyed all of the product that it received from RxUSA that it did not ship out, whether that product was creditable or not, and refused to give RxUSA any information it was receiving regarding credits being issued by manufacturers. By February 2, 2004, all of RxUSA's product had been returned for credit

-14-

or destroyed pursuant to manufacturer's policy and direction. At that time, Capital simply stopped responding to RxUSA's requests for information.

## ANALYSIS

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must accept as true the evidence of the nonmovant and draw all justifiable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Ultimately, the "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## I.    Intentional Misrepresentation[6]

In Wisconsin, a common law claim for intentional misrepresentation contains the following elements: (1) defendant made a factual representation; (2) which was untrue; (3) the defendant made the representation knowing it was untrue or made it recklessly without caring whether it was true or false; (4) the defendant made the representation with intent to defraud and to induce another to act upon it; and (5) the plaintiff believed the statement to

---

[6] RxUSA's tort claims – misrepresentation and negligence – are not barred by the economic loss doctrine because the contract between RxUSA and Capital is a contract for services. *See Ins. Co. of N. Am. v. Cease Elec. Inc.*, 276 Wis. 2d 361, 365, 688 N.W.2d 461, 2004 WI 139. The parties agree that Wisconsin law applies.

be true and relied upon it to his/her detriment. *See Kaloti Enters., Inc. v. Kellogg Sales Co.*, 283 Wis. 2d 555, 569, 699 N.W.2d 205, 2005 WI 111. Wisconsin law generally limits fraudulent misrepresentation to present, or preexisting, material facts, not to any promises of future events. *See U.S. Oil Co. v. Midwest Auto Care Servs., Inc.*, 150 Wis. 2d 80, 86, 440 N.W.2d 825 (Wis. Ct. App. 1989) (citing *Hartwig v. Bitter*, 29 Wis. 2d 653, 656, 139 N.W.2d 644 (1966)). Wisconsin recognizes a limited exception to this rule when the promise is made with a present intention not to perform in the future. *See Guyer v. Cities Service Oil Co.*, 440 F. Supp. 630, 632 (E.D. Wis. 1977) (citing *Alropa Corp. v. Flatley*, 226 Wis. 561, 566, 277 N.W. 108 (1938)). To be actionable, such inducements must be promises "upon which the purchaser has a right to rely." *Id.* In other words, the claimant's reliance must be justifiable or reasonable. *See Ritchie v. Clappier*, 109 Wis. 2d 399, 404, 326 N.W.2d 131, 134 (Ct. App. 1982).

RxUSA helpfully reduces its evidence of misrepresentation into two general categories: (1) misrepresentations regarding Capital's general business practices; and (2) misrepresentations specific to the relationship between Capital and RxUSA. The central misrepresentation is Capital's alleged guarantee that customers would receive 100% of Capital's ERV calculation.

Capital initially argues that any alleged statements outside of the Service Agreement are inadmissible under the parol evidence rule. The parol evidence rule renders evidence of misrepresentation inadmissible to contradict the written terms of an unambiguous agreement. *See State v. Conway*, 26 Wis. 2d 410, 417, 132 N.W.2d 539 (1965). However, the parol

-16-

evidence rule is inapplicable in the context of a tort claim for misrepresentation. In other words, parol evidence is not offered by RxUSA to contradict the terms of the written Service Agreement. *See, e.g., Winger v. Winger*, 82 F.3d 140, 146 (7th Cir. 1996) ("Plaintiff . . . brings a *tort* claim for intentional misrepresentation that is independent of a cause of action for breach of contract. . . . The parol evidence rule does not bar evidence of Defendant's intentional misrepresentation") (emphasis in original).

Capital argues that RxUSA could not reasonably rely upon the alleged misrepresentations because they are contradicted by the express terms of the Service Agreement. *See Amplicon, Inc. v. Marshfield Clinic*, 786 F. Supp. 1469, 1478 (W.D. Wis. 1992); *Durkee v. Goodyear Tire & Rubber Co.*, 676 F. Supp. 189, 193 (W.D. Wis. 1987). Section 20 of the Service Agreement contains an integration clause which states that "This Agreement contains the full agreement between the parties." D. 91, Exhibit C, Section 20. However, the agreement also provides that it "will include the normal contractual responsibilities for each party." *Id.*, Section 2. According to the evidence provided by RxUSA, Capital represented that the "normal contractual responsibilities" language would encompass representations that were not included in the Service Agreement that was ultimately reduced to writing. This creates an issue of fact regarding the reasonableness of RxUSA's reliance upon representations outside of the Service Agreement.

More specifically, Capital argues that it was unreasonable to rely upon the repeated guarantee that RxUSA would receive 100% of its ERV because the guarantee was contradicted by the Service Agreement. Section 11 of the Service Agreement provides that

-17-

"Capital Returns does not warrant that any current manufacturer refund policies will continue or that any *processing of outdates* will result in a credit to RxUSA" (emphasis added). However, this language does not necessarily contradict the alleged 100% guarantee. Section 11 does not refer to ERV, and ERV is not referenced anywhere else in the Agreement. A different (and reasonable) interpretation is that the language "processing of outdates" refers to the time period during which Capital conducts its evaluation of goods to determine ERV. Pursuant to this interpretation, the alleged "100% of ERV" guarantee applies *after* Capital separated returnable from nonreturnable goods (i.e., after the process is completed). In other words, the language is not as clear as Capital claims it to be. The Court cannot conclude that RxUSA's reliance was unreasonable as a matter of law in light of the language in the Service Agreement.

Capital further argues that RxUSA cannot prove that Capital's representations were made with a present intention not to perform. *See Durkee*, 676 F. Supp. at 193. Capital's ultimate failure to perform cannot establish a present intention not to perform the alleged misrepresentations. *Id.* at 194. However, Capital goes farther by completely denying that it made an unqualified "100% of ERV" guarantee. Assuming, as the Court must, that such a guarantee was actually made, Capital's complete and total denial "is open to no other interpretation than that there was no intention of performing the guaranty at the time [defendant] made such representation to the plaintiffs." *Anderson v. Tri-State Home Improvement Co.*, 268 Wis. 455, 463, 67 N.W.2d 853 (1955).

-18-

In addition, RxUSA provides evidence of defendants' insistence that they were bound only by the written terms of the Service Agreement. For example, defendant Dance testified as follows:

> Q: So, if it is not in your contract, you don't provide it?
>
> A: Our contracts would determine what we do.
>
> Q: Right. Nothing else? Nothing that you might have said to the client before; nothing that you might have put in a document before; the only thing that you provide is what's in the contract, right?
>
> A: That's correct.

(D. 105, Dance Deposition at 98).[7] This gives rise to the inference that Capital's pre-contractual representations were made only for the purpose of inducing the contract, and there was no present intention to perform on those promises.

Finally, Capital argues that RxUSA's fraud claim should be dismissed for failure to prove or create an issue of fact on damages. Capital's damages argument is waived because it was raised for the first time on reply. *See Kelso v. Bayer Corp.*, 398 F.3d 640, 643 (7th Cir. 2005).[8] Setting aside the waiver, there is enough evidence in the record to create an

---

[7] Dance further testified that if a promise or representation was "not in the contract, that would not be an obligation [of Capital], even if he included the promise or representation in an e-mail to RxUSA." *See* Dance Deposition at 105.

[8] For the first time in its reply, Capital also argues in a footnote that its pre-contractual guarantees were "meaningless sales patter" and "puffery." Capital's alleged "100% of ERV" promise was not a subjective representation. On summary judgment, the Court cannot conclude that it was unreasonable for RxUSA to rely upon *any* of the alleged misrepresentations, including the "100% of ERV" promise. *See Corley v. Rosewood Care Center, Inc. of Peoria*, 388 F.3d 990, 1008-09 (7th Cir. 2004) ("The phrase 'high quality' is highly subjective. . . . Without elaboration, it comes under the category of sales puffery upon which no reasonable person could rely in making a decision . . .").

issue of fact regarding whether RxUSA was damaged by acting in reliance on Capital's fraudulent misrepresentations.

## II.     Breach of Warranty

RxUSA's breach of warranty claim is based on Capital's written and oral "100% of ERV" guarantee.  The initial solicitation provides that "Capital Returns guarantees that customers actively participating in the program will receive 100% of the Estimated Return Value. *If the Estimated Return Value is less than 100%, we will issue the pharmacy a credit for the difference of our service fee*" (emphasis added).  Capital argues that the guarantee in the first sentence is qualified by the second sentence, which states that Capital will cut its commission percentage if RxUSA does not receive 100% of ERV.  At best, the emphasized language is ambiguous as to how it impacts the initial guarantee.  Clearly, there is some form of guarantee here, supplemented by oral representations that were not accompanied by any substantive limitations.  Under the well-established rule that contractual ambiguities must be construed against the drafter, the Court cannot dismiss RxUSA's claim based upon a plain language reading.  *See Wisconsin Label Corp. v. Northbrook Prop. & Cas. Ins. Co.*, 233 Wis. 2d 314, 328, 607 N.W.2d 276, 2000 WI 26.  The Court sees little relevance in distinguishing between a qualified or an unqualified guarantee.

The main question is whether the guarantee (in whatever form) is enforceable.  Capital invokes the parol evidence rule again, this time in its appropriate context.  Capital portrays the Service Agreement as a completely integrated contract, one which precludes the introduction of parol evidence to vary its terms.  The Court already discussed the relevant

-20-

contract provisions in the context of its "reasonable reliance" argument. In short, Section 20's integration clause ("This Agreement contains the full agreement between the parties") is limited by Section 2 (contract "will include the normal contractual responsibilities for each party"). Taken together, these two provisions render the Service Agreement only partially integrated. "When a writing is shown to be only a partial integration of the agreement reached by the parties, it is proper to consider parol evidence which establishes the full agreement, subject to the limitation that such parol evidence does not conflict with the part that has been integrated in the writing." *Production Credit Ass'n v. Rosner*, 78 Wis. 2d 543, 548, 255 N.W.2d 79 (1977). The Court also held, *supra*, that the language in Section 11 (pertaining to the "processing of outdates") does not conflict with the alleged "100% of ERV" guarantee. Therefore, RxUSA's parol evidence in support of its breach of warranty claim is admissible to supplement the terms of the written Service Agreement. The Court's rationale applies with equal force to RxUSA's Breach of Contract Claim (Count V).[9]

## III. Negligence – Bailment

Capital argues that this claim should be dismissed because RxUSA raised the concept of bailment for the first time in response to Capital's motion for summary judgment. This argument is without merit. Both the current version of RxUSA's complaint and the original complaint alleged that "Capital was negligent in dealing with the goods delivered to it by Plaintiffs in that it failed to exercise that duty of care which is exercise [sic] by similarly

---

[9] This is a new claim in RxUSA's amended complaint. The Court granted leave to file this amendment after Capital filed its motion for summary judgment. The parties agree that their arguments with respect to the breach of warranty claim also apply to this new claim.

-21-

situated entities in handling such goods and obtained credits therefore." D. 26, Complaint, ¶ 55.[10] These allegations encompass the legal concept of bailment. Under the notice pleading standard, a plaintiff is only required to plead "claims, not facts or legal theories." *Vincent v. City Colleges of Chicago*, 485 F.3d 919, 923 (7th Cir. 2007). Capital always had notice of RxUSA's claim pursuant to the pleadings, which distinguishes this case from the cases cited by Capital. *See Conner v. Illinois Dept. of Natural Resources*, 413 F.3d 675, 679 (7th Cir. 2005); *E.E.O.C. v. Lee's Log Cabin, Inc.*, 546 F.3d 438, 443 (7th Cir. 2008) (distinguishing a "mere adjustment in the legal theory of the case" from "a major alteration of 'what the claim is' and the 'grounds upon which it rests'"). RxUSA's use of a bailment theory in response to Capital's motion for summary judgment is not an impermissible attempt to amend the complaint.

A bailment is created by "the delivery of personal property from one person to another to be held temporarily for the benefit of the bailee, the bailor, or both." *Yao v. Chapman*, 287 Wis. 2d 445, 458, 705 N.W.2d 272, 2005 WI App 200. A bailment may be created pursuant to an express or implied contract. *Id.* "Under a bailment, 'the word contract is used in a broad sense.' . . . [A] bailment is rooted in tort principles of negligence, not contract." *Id.* at 467. Accordingly, the relevant duty is defined by general tort principles, although the duty may arise from a contractual relationship. *See Bushweiler v. Polk County Bank*, 129 Wis. 2d 357, 359, 384 N.W.2d 717 (Ct. App. 1986); *Burns v. State*, 145 Wis. 373, 128 N.W. 987, 990 (1910). This accords with the general rule in Wisconsin that "a breach of contract is not

---

[10] RxUSA does withdraw the language "and obtained credits therefore" from the pleadings in response to Capital's motion for summary judgment. This alteration does not prejudice Capital.

a tort, but a contract may create the state of things which furnishes the occasion of a tort. . . . the 'state of things' which arises out of a contract furnishes the occasion for the tort, but not the underlying duty for the tort." *Landwehr v. Citizens Trust Co.*, 110 Wis. 2d 716, 722-23, 329 N.W.2d 411 (1983) (citing *Colton v. Foulkes*, 259 Wis. 142, 47 N.W.2d 901 (1951)).

Capital argues that a bailment was not created because the contract did not contemplate the return of pharmaceutical goods to RxUSA. "The law is that, in order to constitute a bailment, there must be an agreement, expressed or implied, to redeliver the property bailed when the purpose of the bailment has been fulfilled." *Am. Nat. Red Cross v. Banks*, 265 Wis. 66, 69, 60 N.W.2d 738 (1953). However, there is evidence in the record suggesting that Capital agreed to return goods to RxUSA that were deemed unreturnable by the manufacturers.[11] In other words, Capital undertook a duty to safeguard and ultimately return that portion of the pharmaceutical products which, as it turned out, could not be submitted to the manufacturer for credit. Capital may be held liable for negligence under this theory.

Capital also argues that this claim should be dismissed because RxUSA fails to provide evidence of damages. Once again, this argument was raised for the first time in Capital's reply, so the argument is waived for purposes of summary judgment. *See Kelso*, 398 F.3d at 643.[12] RxUSA should have the opportunity to prove that it was damaged by

---

[11] This evidence contradicts Section 4 of the Service Agreement, which provides that "Capital Returns will take the responsibility of arranging for destruction of all non-returnable pharmaceutical products . . ." The Court must resolve this conflict in favor of RxUSA, the nonmoving party.

[12] This is true even though RxUSA did not raise the concept of bailment until it responded to Capital's motion for summary judgment. Damages is a necessary element of any claim for negligence.

-23-

Capital's alleged negligence at trial. *See United States v. Crown Equip. Corp.*, 86 F.3d 700, 707 (7th Cir. 1996) ("the general measure of damages for tort claims involving the complete destruction of personal property [is] the fair market value of the property at the time and place of its destruction").

## IV.  Capital's Counterclaim

Finally, Capital moves for summary judgment on its counterclaim for unpaid commission payments.[13]  Section 4 of the Service Agreement provides for a Service fee of "2.50% of the estimated acquisition cost (EAC) of all inventory shipped to Capital Returns." It is unclear whether the calculations in the invoice (D. 120, Exhibit B) are based upon EAC or ERV.  This issue of fact precludes summary judgment on Capital's counterclaim.

Also, RxUSA's duty to pay Capital's commission may be excused by a material breach. *See Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 183, 557 N.W.2d 67 (1996).  The issue of whether a party's breach excuses the other party's future performance is a question of fact under Wisconsin law. *See id.* at 184.  The Court cannot resolve this issue of fact in the context of Capital's motion for summary judgment.

---

[13]  The amount of the invoice is $46,194.12.  Capital alleges in the amended answer that the amount due and owing on the invoice is $43,242.01.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1.     Capital's motion for summary judgment [D. 88, 121] is **DENIED**; and

2.     The Court will initiate and conduct a telephonic status conference on **August 13, 2009** at **10:00 am (CST)**.  The purpose of the call will be to schedule this matter for trial and a final pretrial conference.

Dated at Milwaukee, Wisconsin, this 10th day of July, 2009.

**SO ORDERED,**

*s/ Rudolph T. Randa*
**HON. RUDOLPH T. RANDA**
**Chief Judge**

Case 2:06-cv-00790-RTR   Filed 07/10/09   Page 25 of 25   Document 126